**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
**DAMARCUS S., by and through his**        )
**Parent, K.S.,**                                      )
                                                        )
    **Plaintiffs,**                          )
                                                        )
    **v.**                                     )          **Civil Action No. 15-851 (ESH)**
                                                        )
**DISTRICT OF COLUMBIA,**                    )
                                                        )
    **Defendant.**                          )
_____ )

## MEMORANDUM OPINION

Plaintiff Damarcus S. is a sixteen year-old student in the District of Columbia Public

Schools ("DCPS") who has been diagnosed with an intellectual disability.  (*See* Administrative

Record ("AR") at 443.)  Damarcus and his mother K.S. bring this suit under the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, and Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794.  They allege that the District of Columbia ("the

District") has failed repeatedly over many years to provide Damarcus with a Free Appropriate

Public Education ("FAPE"), as required by the IDEA.  After an administrative due process

hearing, plaintiffs were awarded fifty hours of compensatory education for the District's failure

to provide an appropriate behavioral plan in 2013 and 2014.  (*See* AR at 1-17.)  Otherwise, the

majority of their claims were dismissed as either time-barred or lacking in merit.  (*Id.*)  Plaintiffs

challenge those rulings in the Hearing Officer's Determination ("HOD").  (*See* Compl. [ECF No.

1].)

Although the IDEA provides that the District Court "shall hear additional evidence at the

request of a party," 20 U.S.C. § 1415(i)(2)(C), neither party has identified any deficiency in the

record or moved for an evidentiary hearing.  Instead, they have each filed cross-motions for

summary judgment based on the existing administrative record.  (*See* Pls.' Mot. for Summ. J.

[ECF No. 15]; Def.'s Cross-Mot. for Summ. J. [ECF No. 17].)  For the reasons set forth below,

the parties' cross-motions are granted in part and denied in part, and the case will be remanded

for further proceedings before the Hearing Officer.

## BACKGROUND

Damarcus entered DCPS as a first grader in the 2006-2007 school year.  (*See* AR at 30.)

The District gave him a comprehensive psychological evaluation in November 2006, which

showed "severe cognitive problems," assessment scores in the Below Average to Lower Extreme

range, overall thinking and reasoning abilities in the 1st percentile, and behavioral problems that

had previously resulted in a diagnosis of Oppositional Defiant Disorder.  (*See id.* at 29-39.)  The

2006 evaluation also noted that the previous year Damarcus had been found to have a Full Scale

IQ ("FSIQ") of 76.  (*See id.* at 30.)  The following year he was diagnosed by the District with an

intellectual disability and placed full-time in the special education classroom.  (*See id.* at 6, 40.)

Damarcus faces numerous other challenges, including Attention Deficit Hyperactivity Disorder

(*id.* at 289) and periods of homelessness (*see id.* at 432 (noting that Damarcus's family "has been

displaced twice without securing permanent housing").  Nevertheless, the record consistently

reflects both his friendliness and his eagerness to learn.  (*See, e.g.*, *id.* at 6 ("a pleasant and

engaging young man with many social strengths"); *id.* at 132-33 (a friendly student "who is

eager to attend and puts forth effort to complete activities requested of him").)

Since entering DCPS, Damarcus has failed to make meaningful academic progress in key

areas—as an eighth grader, Damarcus's literacy and written expression skills were at a

kindergarten grade level, while his mathematics skills ranged from kindergarten to second grade

level.  (*See id.* at 243-48.)  This lack of progress is illustrated starkly in Damarcus's 2014

Individualized Education Program ("IEP"),[1] which indicated that his baseline in written

expression had not changed in nearly three years.  (*See id.* at 248 (stating baseline "[a]s of

8/30/11").)  His goals and objectives, which also remained static across multiple IEPs, similarly

indicate his lack of progress.  (*See, e.g.*, *id.* at 67-69, 154-55 (2012 IEP goals and objectives in

mathematics, reading, and written expression all repeated word-for-word in 2013 IEP).  Despite

this, the level of individual services provided by DCPS steadily decreased throughout the

relevant time period.  In 2010 and 2011, as a student at Malcolm X Elementary School,

Damarcus received four hours per month of speech-language pathology and four hours per

month of behavioral support (*id.* at 45, 62); in 2012, his behavioral support at Langley Education

Campus was cut in half to two hours per month (*see id.* at 71); the following year, his speech-

language hours were cut to two hours per month (*see id.* at 159); and in 2014, having moved on

to McKinley Middle School, Damarcus's speech-language hours were cut to thirty minutes per

month.  (*See id.* at 251.)

The District re-evaluated Damarcus in February 2013.  His Speech-Language

Reevaluation found "severe receptive-expressive language and low receptive-expressive

vocabulary," with results on the TOLD-I:4 assessment in the Very Poor range on every metric.

(*See id.* at 125, 127.)  His Psychological Reevaluation showed scores on the KABC-II

assessment in the Below Average to Lower Extreme range, with an FSIQ of 59.  (*See id.* at 139.)

His scores were even lower on the WJ-III assessment, which measures academic achievement,

thus suggesting that, despite his cognitive difficulties, Damarcus is capable of more than he has

---

[1] The IDEA requires school districts to complete IEPs for disabled students at least annually, setting out the students' achievement levels, goals, and necessary services with input from the students' teachers, administrators, and families.  *See* 20 U.S.C. § 1414(d).

achieved thus far.  (*See id.* at 140-42.)  The evaluation also found "behavior concerns that impact Damarcus's overall functioning within home and school settings."  (*Id.* at 146.)  It concluded that he has "global delays in cognition, academic achievement, and adaptive behavior functioning." (*Id.* at 149.)

On May 16, 2013, plaintiffs filed a Due Process Complaint ("DPC") with the District alleging, *inter alia*, that the February 2013 evaluations were inadequate and inappropriate, that Damarcus's IEPs from 2011 to 2013 were deficient, and that the District should have conducted a Functional Behavioral Assessment ("FBA") in order to provide Damarcus with a Behavioral Intervention Plan ("BIP").  (*See id.* at 175-81.)  On January 29, 2014, they filed another DPC, seeking authorization for both an FBA and an Independent Educational Evaluation ("IEE") to examine Damarcus's psychoeducational needs.  (*See id.* at 236-42.)[2]  Finally, plaintiffs filed a complaint on December 16, 2014, raising basically the same deficiencies as those alleged in the May 2013 DPC, but also alleging these deficiencies regarding the 2014 IEP.  (*See id.* at 334-41.)

The December 2014 complaint was buttressed by the conclusions of Dr. Lisi Levisohn, whom plaintiffs hired at their own expense to provide an independent neuropsychological evaluation of Damarcus.  (*See id.* at 289-304.)  Dr. Levisohn's evaluation relied in part on testing that showed Damarcus to have a General Ability Index of 73, with severe deficits in working memory and processing speed.  (*See id.* at 284 (cognitive testing conducted by Dr. Dahlia Topolosky).)  Dr. Levisohn concluded that (1) Damarcus's reading, math, and writing scores were "much weaker than they should be even compared to his intellectual level" (*id.* at 301)

---

[2] Neither of these complaints is at issue here.  Although the record is not clear on this point, it appears that the first complaint was withdrawn after the District authorized an independent evaluation by speech-language pathologist Diane Douglas in October 2013.  (*See id.* at 208-17, 504-05.)

(emphasis omitted), (2) he presents with "extremely deficient auditory working memory and auditory processing" (*id.*), and (3) he has a specific learning disability "beyond what would be expected for his low intellectual level" (*id.* at 303). Plaintiffs also hired Dr. Annie McLaughlin, a behavioral consultant, who submitted a report discussing her brief observations of Damarcus in the classroom. (*See id.* at 311-12.) Thus, in addition to seeking compensatory education and an appropriate IEP for Damarcus moving forward, plaintiffs also sought reimbursement for the IEEs completed by Drs. Levisohn and McLaughlin. (*Id.* at 6.)

A due process hearing was held by Hearing Officer NaKeisha Sylver Blount on March 9 and 12, 2015. (*Id.* at 3-4.) Plaintiffs offered testimony from Damarcus's mother, K.S.; behavioral specialist Dr. McLaughlin; psychologist Dr. Levisohn; speech-language pathologist Ms. Douglas; and Nancy Gregerson, who runs a school specializing in the Lindamood-Bell reading program. (*See id.* at 4.) The District offered testimony from Damarcus's ninth grade teacher, Christina Sandoval; DCPS social worker Vanessa Wortham; DCPS speech-language pathologist Marnie Cato; DCPS program manager Karen Morgan; and DCPS psychologist Courtney Richmond. (*See id.* at 4.) The Hearing Officer subsequently determined that (1) all claims arising from conduct that predated December 16, 2012, were barred by the IDEA's statute of limitations; (2) the District denied Damarcus a FAPE when it failed to conduct a behavioral assessment and put in place an intervention plan in 2013 and 2014; but that (3) all other claims relating to the 2013 and 2014 IEPs lacked merit. (*See id.* at 12-14, 17.) She awarded plaintiffs fifty hours of "behavioral support services to be utilized for mentoring, individual and/or family counseling, and/or any other reasonable purpose of Parent's choice," and she provided that any hours that were not used by June 30, 2016, would be forfeited. (*See id.* at 17.)

**ANALYSIS**

## I.  LEGAL STANDARD

Plaintiffs, as the party challenging the administrative decision, carry the burden of "persuading the court that the hearing officer was wrong."  *See Reid ex rel. Reid v. Dist. of Columbia,* 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C. Cir. 1988)).  The Court must give "due weight" to the hearing officer's determinations and "may not substitute its own notions of sound educational policy for those of the school authorities."  *S.S. ex rel. Shank v. Howard Road Academy,* 585 F. Supp. 2d 56, 63-64 (D.D.C. 2008) (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982)).  That said, less deference is to be accorded to the hearing officer's decision than would be the case at a conventional administrative proceeding, and a decision "without reasoned and specific findings deserves little deference."  *Reid,* 401 F.3d at 521 (quoting *Kerkam v. Superintendent, D.C. Pub. Schs.,* 931 F.2d 84, 87 (D.C. Cir. 1991)).  The Court is "obligated by the IDEA to ensure that relief set forth in the administrative award was 'appropriate,'" so the Court may not simply defer to the hearing officer's discretion if the basis for her award is not explained.  *See id.*  Moreover, where the administrative record lacks "pertinent findings" and where neither party requested "consideration of additional evidence, the [Court] may determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings."  *Id.* at 526.  Finally, on pure questions of law, such as the IDEA's proper statutory construction, the standard of review is de novo.  *Id.* at 521.

## II.  STATUTE OF LIMITATIONS

Plaintiffs first challenge the Hearing Officer's dismissal of all allegations related to the September 28, 2010, May 17, 2011, and February 20, 2012 IEPs, as well as any claims related to the implementation of the February 2012 IEP prior to December 16, 2012.  (*See* AR at 14-17.)

They argue that a recent Third Circuit opinion clearly demonstrates that the Hearing Officer

misinterpreted the IDEA's statute of limitations provisions, so as to reach only violations that

occurred within two years of the filing of the DPC.  (*See* Pls.' Mot. for Summ. J. at 7-10 (citing

*G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601 (3d Cir. 2015).)  Plaintiffs are correct that

the Hearing Officer's statute of limitations analysis was flawed, but that does not necessarily

entitle them to pursue all of the claims they assert here.

There are two provisions in Section 1415 of the IDEA that bear upon the relevant

limitations period: (b)(6) and (f)(3)(C).  *See* 20 U.S.C. § 1415(b)(6), (f)(3)(C).  The first

unambiguously establishes a filing deadline, requiring a due process hearing be requested

"within 2 years of the date the parent or agency knew or should have known about the alleged

action that forms the basis of the complaint."  *See id.* § 1415(f)(3)(C).  The second is included in

a section that outlines the types of procedures available under the IDEA, and it mandates

> [a]n opportunity for any party to present a complaint—
>
> **(A)** with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child; and
>
> **(B) which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint**, or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows, except that the exceptions to the timeline described in subsection (f)(3)(D) shall apply to the timeline described in this subparagraph.

*See id.* § 1415(b)(6) (emphasis added).  At first glance, this section appears to set out a remedy

cap—even if under (f)(3)(C) a party timely files within two years of the "knew or should have

known" ("KOSHK") date, it is still prohibited under (b)(6) from recovering for any injury that

preceded the KOSHK date by more than two years.  In other words, the two provisions work in

tandem to create a maximum relief period of four years—two years before and two years after the discovery date—which courts have deemed the "2+2" construction.  *See G.L.*, 802 F.3d at 607.  Plaintiffs unsuccessfully made this argument below (AR at 14-15), and in a reversal of positions, the District now adopts it before this Court.  (*See* Def.'s Cross-Mot. for Summ. J. at 13 n.6.)

However, as the Third Circuit has persuasively held, the 2+2 construction renders the statutory text illogical.  *See G.L.*, 802 F.3d at 614-15.  First, if (b)(6) should be read as a remedy cap, then there is no reason to provide that a state's applicable *filing deadline* should supplant it.  *See* 20 U.S.C. § 1415(b)(6) (providing that "if the State has an explicit time limitation for presenting such a complaint under this subchapter," then state law controls).  By the same token, (b)(6) also incorporates two grounds for equitable tolling that are more logically compatible with a filing deadline than a remedy cap.  *See id.* § 1415(b)(6) ("[T]he exceptions to the timeline described in subsection (f)(3)(D) shall apply to the timeline described in this subparagraph."); *see also G.L.*, 802 F.3d at 617 ("[I]t would be odd indeed for § 1415(b)(6)(B), if it actually described a remedy cap . . . to apply equitable tolling provisions from § 1415(f)(3)(D), but quite logical if § 1415(b)(6)(B) merely restates the statute of limitations to which those equitable exceptions apply.").  Unsurprisingly, then, these identical provisions do apply to the filing deadline set out in (f)(3)(C).  *See* 20 U.S.C. § 1415(f)(3)(C), (D).  By contrast, to construe (b)(6) as unambiguously creating a remedy cap, one must all but disregard the state-borrowing and equitable tolling provisions set forth in the second half of the very same sentence.  *See id.* § 1415(b)(6).

Instead, a more thorough statutory analysis demonstrates that (b)(6) was intended merely to restate the filing deadline in (f)(3)(C), and that the textual ambiguity resulted from an error in

reconciling the House and Senate drafts of a 2004 IDEA amendment. *See G.L.*, 802 F.3d at 616-26. Rather than restate the Third Circuit's lengthy analysis verbatim—which the Court adopts in full—a summary of the key points will suffice:

- *First*, the structure, language, and context of the IDEA strongly suggest that Section 1415(b), which sets out the Act's procedural safeguards, is nothing more than a preamble or precis summarizing the substantive provisions that follow. *See G.L.*, 802 F.3d at 616-18. Thus, the so-called "remedy cap" in (b)(6)—which uses largely identical words and phrases as (f)(3)(C)—was actually intended to be a restatement of the filing deadline set out in (f)(3)(C). *See id.*

- *Second*, construing (b)(6) as a remedy cap would be inconsistent with the Act's broad remedial purpose, *see Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009), in effect working a *sub silentio* repeal of a long line of cases granting comprehensive, uncapped relief to IDEA plaintiffs. *See G.L.*, 802 F.3d at 618-21.

- *Third*, the Department of Education, which is responsible for promulgating regulations under the IDEA, has consistently taken the position that (b)(6) and (f)(3)(C) state the same limitations period. *See id.* at 621 (citing Assistance to States for the Education of Children with Disabilities & Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46,540, 46,706 (Aug. 14, 2006), and a DOE amicus brief filed with the Third Circuit).

- *Fourth*, legislative history indicates that (1) the House bill proposed a one-year limitations period that looked backward from the date of filing; (2) the Senate bill proposed a two-year limitations period that looked forward from the KOSHK date; (3) the conference committee attempted to reconcile both versions in separate statutory provisions, by adopting the Senate's material terms; and (4) the Senate version was incorporated at (f)(3)(C), while the House version was incorporated at (b)(6), but the drafters simply failed to change the House's backward-looking framework to the Senate's forward-looking framework. *See G.L.*, 802 F.3d at 621-24.

Adopting the Third Circuit's analysis, this Court concludes that as long as the complaint is filed within two years of the KOSHK date, plaintiffs are entitled to full relief for that injury. *See id.* at 626.

The Hearing Officer concluded that plaintiffs' complaint "may only include violations dating back as far as two years prior to the filing" of the complaint. (AR at 17.) This phrasing suggests that she incorrectly applied the backward-looking occurrence rule rather than the

IDEA's forward-looking discovery rule, *see G.L.*, 802 F.3d at 613, but when read in context, it is

clear that she calculated KOSHK dates in order to apply the discovery rule. (*See* AR at 17

("[T]he KOSHK date for the violations alleged in the instant case is the same date as the alleged

violations themselves.").) That is, because she believed that the KOSHK dates were identical to

the occurrence dates, the limitations period would have been the same regardless of whether she

counted forward two years from the KOSHK date or two years backward from the filing date.

(*See id.*) Thus, the Court takes no issue with her application of the discovery rule except to the

extent that she determined that plaintiffs should have discovered the alleged IDEA violations on

the very date that they occurred.

Neither the Hearing Officer nor the parties have offered the kind of "fine-grained

analysis" that is necessary to determine discovery dates in a complaint alleging so many different

IDEA violations. *See K.H. v. New York City Dep't of Educ.*, 2014 WL 3866430, at *16

(E.D.N.Y. Aug. 6, 2014) (rejecting hearing officer's broad dismissal of claims arising before a

certain date, because there was no piecemeal analysis of plaintiff's many claims and when she

should have known of them). As noted, the Hearing Officer found that "the KOSHK date for the

violations alleged in the instant case is the same date as the alleged violations themselves," but

she offered no explanation in support of that conclusion. (*See* AR at 17.) Rather, she simply

took for granted that plaintiffs should have been aware of any IEP deficiencies on the very day

the IEP was created, and that any failures in implementation should also have been recognized

instantaneously. (*See id.*) Certainly, there are some deficiencies that can be recognized

immediately by a layperson when an IEP is created. *See, e.g.*, *D.C. v. Klein Indep. Sch. Dist.*,

711 F. Supp. 2d 739, 745 (S.D. Tex. 2010) (plaintiff should have known immediately that

necessary parties were not present for IEP meeting). But the Hearing Officer's blanket finding

that all deficiencies should be immediately recognized puts too great a burden on parents, who often lack the knowledge to understand the complexities of educating disabled children.  *See M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996) ("[A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) . . . .").  Instead, the inquiry should depend upon the particular deficiency asserted, and the parent's ability to recognize it.  *See D.C.*, 711 F. Supp. 2d at 745 (finding that parents had notice of an allegedly deficient IEP by the time they complained to the school about it).

Plaintiffs' position fares no better.  They assert that the appropriate KOSHK date is June 2014, when their expert, Dr. Levisohn, provided her evaluation of Damarcus and found alleged deficiencies in his educational program.[3]  (*See* Pls.' Mot. for Summ. J. at 9-10.)  As the District points out, plaintiffs had previously filed a DPC in 2013 alleging nearly identical injuries to those alleged here.  (*See* AR at 175-81 (May 16, 2013 complaint alleging deficient IEPs from 2011-13, inadequate evaluations in February 2013, and inappropriate behavior management).)  At the *absolute* latest, then, plaintiffs had sufficient knowledge that the claims of 2011-2013 IEP deficiencies, inadequate evaluations, and inappropriate behavior management had accrued by May 16, 2013, and not June 2014.  *See D.C.*, 711 F. Supp. 2d at 745.  Moreover, plaintiffs conflate all of the alleged IDEA violations into a single overarching injury, when their complaints make clear that the District allegedly failed Damarcus in a variety of ways at various points in time, including by not classifying him as disabled in 2006-2007.  (*See, e.g.*, AR at 513

---

[3] Technically, plaintiffs did not seek to have their educational witnesses qualified as experts, but the Hearing Officer determined that they would have been qualified had plaintiffs so requested, and that they offered opinion testimony as if they were qualified experts.  (*See* AR at 8 n.18.)  Thus, the Court will refer to them as "experts."

(asserting that the District failed to even identify Damarcus as disabled prior to October 2007).)

For instance, plaintiffs necessarily became aware of this alleged "child-find" violation when the

District corrected it in October 2007, *see Boose v. Dist. of Columbia*, 786 F.3d 1054, 1056 (D.C.

Cir. 2015) (discussing school districts' "child-find" obligation to recognize students in need of

special education and related services), and therefore, they would have had to file a complaint

asserting that claim by October 2009.[4]

      For its part, the District asserts that plaintiffs had long known of (a) Damarcus's lack of

educational progress, and (b) that the District was responsible for his education, so they had

sufficient knowledge of their potential claims long before December 2012.  (*See* Def.'s Cross-

Mot. for Summ. J. at 12-14.)  In essence, the District argues that because plaintiffs knew of

Damarcus's lack of progress, they were on immediate notice of an IDEA violation whenever the

District took some action that allegedly failed to rectify the situation.  (*See* Def.'s Reply Br.

[ECF No. 19] at 4.)  But the mere knowledge that Damarcus was not making progress is not

enough to trigger notice, because the lack of progress could have been attributable to Damarcus's

low aptitude rather than inadequate educational support.  *See K.H.*, 2014 WL 3866430, at *19

("[A] lack of progress alone is insufficient to put parents on notice of an IDEA claim if the

parents have no baseline to assess how much progress their child is capable of making.").  Other

than an outdated 2006 evaluation, which the District itself suggests is "inherently unreliable"

(*see* Def.'s Cross-Mot. for Summ. J. at 13), there is little indication in the record that Damarcus's

mother had enough information to attribute his lack of progress to the District.

---

[4] To be clear, plaintiffs have not raised a "child-find" claim here or before the Hearing Officer—
the Court simply uses it to illustrate a claim that would be time-barred.

Therefore, the Court finds that the bulk of plaintiffs' then-existing claims accrued no later than March 4, 2013, when Damarcus's mother was apprised of the District's recent psychological and speech-language evaluations at an IEP meeting.  (*See* AR at 153-56.)  These evaluations demonstrated starkly the extent to which Damarcus had fallen further behind his peers and the disparity between certain cognitive abilities and his alarmingly low achievement scores.  (*See id.* at 115-52 (evaluations); *id.* at 1263:6-1264:10 (testimony of DCPS psychologist that she would not have predicted Damarcus's reading scores to be as low as they were, given his cognitive scores).)  Having previously been offered a much rosier assessment of Damarcus's progress, plaintiffs were finally provided with the harsh reality of his testing results.  (*See, e.g.*, *id.* at 84 (Nov. 2011 report that "[p]rogress is being made" in addition/subtraction, reading comprehension, and writing); *id.* at 80 (Jan. 2012 report that Damarcus "is showing some progress in reading"); *id.* at 75 (June 2012 report that Damarcus "has mastered telling time to the hour with 80% accuracy in 4/5 trials," and "is progressing" in letter identification).)  It was also at the March 2013 IEP meeting that, in response to these devastating evaluations, the District *decreased* Damarcus's speech-language services by half.  (*Compare id.* at 71 *with id.* at 159.)  Having "gained new information that made them aware of [alleged] inadequacies in the student's prior special education program," *see K.H.*, 2014 WL 3866430, at *19, plaintiffs were put on notice of most if not all of their existing claims in March 2013, and thus their December 2014 DPC was timely filed.

Because the Hearing Officer erroneously dismissed all claims arising out of pre-December 2012 conduct, on remand she should reconsider the timeliness of those claims, analyzing each alleged IDEA violation individually.  As discussed, the Court takes exception only with her blanket dismissal—if she determines that certain alleged violations should have

been immediately apparent *even to a layperson like Damarcus's mother* prior to December 16, 2012, then those claims could still be properly dismissed as time-barred.

That said, it is not clear how much practical effect this will ultimately have, because the IDEA's broad equitable remedies are tied more closely to the child's needs than to the specific deprivations he suffered or when they were suffered. *See Reid*, 401 F.3d at 524 ("[J]ust as IEPs focus on disabled students' individual needs, so must awards compensating past violations rely on individualized assessments."). Thus, unlike a traditional damages remedy, which would require a clear delineation of the time-barred, non-compensable injuries, the IDEA affords discretion to fashion an equitable remedy tied to Damarcus's particular challenges. *See id.* at 523-24 (rejecting a mechanical, hour-for-hour damages calculation in favor of a flexible remedy that "depend[s] on the child's needs"); *Brown v. Dist. of Columbia*, 2016 WL 1452330, at *12 (D.D.C. Apr. 13, 2016) (declining to consider plaintiff's remaining claims of IDEA violations because the remedy provided in response to other claims had already made plaintiff whole); *K.H.*, 2014 WL 3866430, at *20 ("The equitable remedies available under the IDEA are flexible and do not turn on the number of specific IDEA violations asserted for each school year."). Nevertheless, because this equitable analysis remains informed by the "educational benefits that likely would have accrued" absent a cognizable IDEA violation, *see Reid*, 401 F.3d at 524, due consideration should certainly be given to which violations are time-barred and which are not.

## III. INDIVIDUALIZED EDUCATIONAL PROGRAMS

Plaintiffs allege a host of deficiencies in Damarcus's 2013 and 2014 IEPs (AR at 4-5), and with the exception of the District's failure to provide an appropriate behavioral plan, the Hearing Officer concluded that plaintiffs failed to meet their burden as to all other alleged deficiencies. (*Id.* at 12-13.) Plaintiffs challenge that determination on a number of grounds.

**A. February 2013 Evaluations**

The challenged IEPs were informed by two District evaluations of Damarcus—a February 4, 2013 Speech and Language Evaluation (AR at 119-28) and a February 20, 2013 Psychological Evaluation (*id.* at 129-52).  According to plaintiffs, the IEPs were "inherently flawed and inappropriate" because the underlying evaluations of Damarcus were similarly flawed and inappropriate.  (*See* Pls.' Mot. for Summ. J. at 16.)

Plaintiffs first argue that the Speech and Language Evaluation was inappropriate because the evaluator informally found that Damarcus presents "some difficulty with social language skills," without then conducting any formal assessment or recommending specific remedial instruction.  (*See* Pls.' Mot. for Summ. J. at 15.)  But even without any formal assessment, the evaluation expressly identified this area of concern for "review[] and discuss[ion] by the Multidisciplinary Team" (AR at 127-28), and thus it adequately presented the issue to those formulating Damarcus's IEP.  This is a far cry from the speech-language evaluation in *Roca v. District of Columbia*, which completely "failed to identify [the student's] weaknesses in expressive and receptive language" and thus did not identify the need for speech-language therapy.  *See* 2005 WL 681462, at *5 (D.D.C. Mar. 14, 2005).

As for the Confidential Psychological Report, plaintiffs assert that it was "inadequate and failed to explain significant discrepancies in Damarcus'[s] scores."  (Pls.' Mot. for Summ. J. at 13.)  First, they argue that the District's evaluator inexplicably failed to complete the cognitive testing, evaluating Damarcus on only 10 of the 18 KABC-II subtests.  (*Id.*)  The Hearing Officer did not address this discrepancy, but concluded only that Damarcus "received a comprehensive psychological assessment . . . in February 2013."  (*See* AR at 8.)  Similarly, the District does not respond to this argument, and therefore, it is deemed conceded.  *See DIRECTV, Inc. v. F.C.C.*,

110 F.3d 816, 829 (D.C. Cir. 1997).  However, plaintiffs have not explained how the incomplete

KABC-II testing harmed Damarcus, because their own expert evaluations show largely similar

results.  (*Compare* AR at 139 (DCPS evaluation showing KABC-II standard scores ranging from

57 (Lower Extreme) to 75 (Below Average)) *with id.* at 284 (plaintiffs' evaluation showing

WISC-IV composite scores ranging from 53 (Extremely Low) to 75 (Borderline)).[5]

Instead, the primary disagreement between the parties is how the testing results should

have been interpreted.  Plaintiffs argue that the gaps between certain psychological testing

metrics should have been explained by the evaluator.  (*See* Pls.' Mot. for Summ. J. at 13.)

Specifically, on the KABC-II test, Damarcus scored eighteen points higher on the Knowledge

Index than he did in the Planning Index (AR at 139); on the Woodcock Johnson test (WJ-III), he

scored twenty-three points higher in Broad Written Language than in Broad Reading (*id.* at 140);

and all of his achievement scores (WJ-III) were well below his cognitive scores (KABC-II) (*see

id.* at 139-140).  There is no question that the evaluator did not address these gaps; instead, she

concluded that Damarcus has "global deficiencies" across the board.  (*See id.* at 149.)  The

District argues that the gaps in Damarcus's raw scores are "meaningless" when considered

alongside their corresponding percentile ranks, which do not suggest the same disparity.  (*See*

Def.'s Cross-Mot. for Summ. J. at 21.)  It thus contends the eighteen-point gap on the KABC-II

test amounts to an "insignificant" 4.8 percentile rank difference, while the twenty-three point gap

on the WJ-III test amounts to a "meager 1 percentile rank difference."  (*Id.*)

The District's wholesale rejection of the raw scores is at odds with the tests themselves,

which use raw score rather than percentile rank to place students in a particular descriptive

---

[5] It should also be noted that there is evidence suggesting plaintiffs' expert evaluations similarly relied on incomplete testing.  (*See* AR at 414, 1217:4-21.)

category.  (*See* AR at 139-40.)  For instance, Damarcus's KABC-II Knowledge and

Simultaneous Scores place him in a different descriptive category ("Below Average") than his

Planning Score ("Lower Extreme").  (*See* AR at 139.)  Especially with intellectually disabled

students—who lag far behind their peers across the board—percentile rank may actually serve to

*mask* statistically significant differences.  For example, consider a severely disabled student

whose raw Knowledge Score improves from a 5 to a 55 in a single year.  She may, when

compared to her peers, still fall below the first percentile rank, but it would nevertheless be

unwarranted to dismiss that fifty-point improvement as "insignificant" or "meager."  Thus,

although there is value in knowing the percentile rank (*see* Def.'s Reply Br. at 9), the Court

declines to disregard raw scores altogether.

 Moreover, the District is simply incorrect when it claims that "there are no outliers in the

student's ability to understand information."  (Def.'s Cross-Mot. for Summ. J. at 22.)  In

comparison to his raw scores of 40, 48, and 44 on the Broad Written Language subtests,

Damarcus scored a *single point* in Passage Comprehension, a subtest in which a score of 90-110

is described as "Average."  (*See* AR at 140.)  That disparity is even more marked when his

scores on the Broad Math subtests are considered: 37 (Applied Problems), 41 (Calculation), and

56 (Math Fluency).  (*See id.*)  On the KABC-II, the eighteen-point discrepancy between his

Knowledge and Planning Scores—and the seventeen-point discrepancy between Simultaneous

and Planning—suggest strongly that Damarcus faces specific, identifiable challenges rather than

being uniformly disabled.  (*See id.* at 139.)  And although the comparison of his KABC-II

cognitive results and his WJ-III achievement results may be an imperfect one, the February 2013

evaluation does suggest that Damarcus is capable of more than he has achieved thus far.

(*Compare id.* at 139 (KABC-II results) *with id.* at 140 (WJ-III results); *see also id.* at 708:1-12

17

(testimony of Dr. Levinsohn that Damarcus's "achievement scores are significantly lower that you would expect" when compared against either his GAI or FSIQ scores).)  As discussed, however, the District's evaluator did not address any of these disparities, instead finding only that Damarcus presents with "global deficiencies."  (*Id.* at 149.)

The parties also dispute how the evaluations should be interpreted with regard to Damarcus's overall cognitive ability.  The District argues that full-scale IQ is the most comprehensive measure, and Damarcus's FSIQ of 59 (Lower Extreme, 0.3 percentile) accurately reflects the extent of his intellectual disability.  (*See* Def.'s Cross-Mot. for Summ. J. at 20-21.) Plaintiffs suggest that the District places too much reliance on the single FSIQ data point, which obscures a significant weakness in processing speed and working memory in relation to his other cognitive scores.  (*See* Pls.' Mot. for Summ. J. at 13-14.)  Dr. Levisohn testified that processing speed and working memory are not indicators of cognitive potential, so including those measures in the overall FSIQ determination is "less meaningful and in some ways a distortion of [Damarcus's] actual cognitive ability."  (AR at 704:11-707:2.)  Because the General Ability Index (GAI) does not incorporate processing speed or working memory, Dr. Levisohn states that Damarcus's GAI of 73 is a more accurate measure of his cognitive ability (*see id.*), while his weakness in processing and working memory constitutes "a Specific Learning Disability beyond what would be expected for his low intellectual level."  (*Id.* at 303).  In turn, the District faults Dr. Levisohn's use of GAI as selectively ignoring the very traits that make Damarcus intellectually disabled, in order to inappropriately diagnose him with a specific learning disability.  (*See* Def.'s Reply Br. at 8 (citing 34 C.F.R. § 300.8(c)(10)(ii) ("Specific learning disability does not include learning problems that are primarily the result of . . . mental retardation . . . .").)

When considering an issue of such complexity, it is helpful to step back and re-focus on the relevant inquiry.  The question is not whether the Court might be inclined to analyze Damarcus's scores differently than the District did, but whether the District's evaluations were so deficient that the resulting IEPs "were inherently flawed" and denied Damarcus a FAPE.  (*See* Pls.' Mot. for Summ. J. at 16.)  Under that standard, plaintiffs have not met their burden of proof.

In conducting its evaluations, the District was required only to "[u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about [Damarcus] . . . *that may assist in determining*" his level of disability and an appropriate educational plan.  *See* 34 C.F.R. § 300.304(b) (emphasis added).  Plaintiffs have not identified any requirement that the evaluation offer a particular analysis of the information or explain data points that seem inconsistent with one another.  *See id.*  In other words, it is the responsibility of the IEP team (not the evaluator) to analyze the data and determine the appropriate course of action.  *See* 20 U.S.C. § 1414(c)(1), (4) (the IEP Team shall "review existing evaluation data . . . [and] on the basis of that review" decide if more data are needed before it can "determine the child's educational needs").

In the cases cited by plaintiffs, the school districts' evaluations failed to assess the students' level of cognitive impairment, such that the resulting IEPs were necessarily deficient. *See Cty. Sch. Bd. v. R.T.*, 433 F. Supp. 2d 657, 663, 675-76 (E.D. Va. 2006) ("[T]he School Board greatly misunderstood RT's cognitive capacity and educational needs and thereby designed an IEP that both underestimated and inappropriately served him."); *Roca*, 2005 WL 681462, at *5 ("Because DCPS' evaluations were incomplete, the resulting IEP that DCPS developed was not appropriately tailored to Minor's educational needs.").  Here, the District's psychological evaluation sufficiently demonstrated Damarcus's specific deficits in working

memory and processing speed, in addition to his more general intellectual disability.  (*See, e.g.*, AR at 137 ("Damarcus's performance fell in the deficient range and less than the 1st percentile indicating a deficient psychological processing area.").)  Thus, regardless of how the evaluator labeled these deficits, or whether she made more effort to explain or analyze them in relation to his overall ability, the IEP team had the raw information it needed to create an appropriate plan for Damarcus.[6]

## B.  Substantively Flawed IEPs

Although an IEP need not be designed to maximize a disabled student's potential, it must nevertheless be "reasonably calculated to produce meaningful educational benefit."  *See A.I. ex rel. Iapalucci v. Dist. of Columbia*, 402 F. Supp. 2d 152, 167 (D.D.C. 2005); *see also Rowley*, 458 U.S. at 200 ("Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child.").  The adequacy of an IEP must be assessed as of the time the IEP was developed, rather than in hindsight.  *See S.S.*, 585 F. Supp. 2d at 66.  Moreover, technical violations of the IDEA are insufficient to prove a denial of a FAPE unless they "(1) result in the loss of educational opportunity; or (2) seriously infringe upon the parents' opportunity to participate in the IEP formulation process; or (3) . . . caused a

---

[6] Plaintiffs also challenge the alleged gap between the 2006 and February 2013 evaluations, arguing that the District's reliance on such outdated testing in creating the 2010, 2011, and 2012 IEPs clearly violates the IDEA.  (*See* Pls.' Mot. for Summ. J. at 15-16.)  However, that alleged gap was irrelevant to the Hearing Officer's decision, as she only considered claims pertaining to the IEPs that were developed *after* (and were based upon) the February 2013 evaluations.  (*See* AR at 4-5 & n.3.)  The parties dispute whether evaluations were conducted between 2006 and 2013, and whether they satisfied IDEA's requirements, but because the Hearing Officer did not reach that issue, the Court declines to resolve it in the first instance.  On remand, the Hearing Officer should determine whether the District conducted adequate, timely evaluations to support the 2010, 2011, and 2012 IEPs.

deprivation of educational benefits." *See A.I.*, 402 F. Supp. 2d at 164 (internal citations and quotations omitted).

Among the numerous objections plaintiffs raise regarding the content of Damarcus's 2013 and 2014 IEPs, they emphasize the IEPs' "fail[ure] to specify, as required by IDEA, that Damarcus would receive research-based, peer-reviewed instruction." (*See* Pls.' Mot. for Summ. J. at 17 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(IV) (IEPs must include "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable")).) However, it is not clear what plaintiffs believe should have been included in the IEPs, as they do not argue that "the 'specific research' (i.e., the name of a specific program) must be identified." (*See* Pls.' Opp'n Br. [ECF No. 18] at 17.) They instead suggest that IEPs must include a more general statement that the student will receive "instruction and services based on peer-reviewed research" and identify the methods through which the student will be taught. (*See id.* (offering as an example "a multisensory, systematic, sequential, research-based program").) By contrast, they claim that Damarcus's IEPs, which stated only that he would receive "Specialized Instruction" (AR at 159, 251), were so vague as to be meaningless. (*See* Pls.' Opp'n Br. at 17.) The District responds that this allegation boils down to nothing more than semantics—the only difference between the District's formulation ("specialized instruction") and plaintiffs' formulation ("multisensory, systematic, sequential, research-based program") is the number of buzz words they contain. (*See* Def.'s Reply Br. at 10.)

The Court need not decide what level of specificity the IDEA requires, because plaintiffs have not shown that the alleged lack of specificity caused Damarcus any educational harm. They baldly assert that the failure to specify the type of research-based instruction Damarcus would

receive "resulted in ineffective, inappropriate, non-research based instruction," thus causing Damarcus's lack of progress.  (*See* Pls.' Mot. for Summ. J. at 18.)  But even if a school district does not explicitly state that the student will receive "research-based instruction," it does not follow that the student will not actually receive that type of instruction.  For instance, the District used the Edmark reading program, which plaintiffs implicitly acknowledge is research-based when they criticize Edmark as being based on outdated research.  (*See id.* at 28 n.16 (noting that the District could not point to "any research *in the last 30 years* [that] supports" Edmark) (emphasis added).)  Similarly, Damarcus's teacher testified that she uses Marzano's nine instructional strategies (AR at 919:19-920:11), which plaintiffs also acknowledge are research-based.  (*See* Pls.' Mot. for Summ. J. at 29 n.19.)  Thus, the Court finds no error in the Hearing Officer's conclusion that Damarcus received research-based instruction, despite the IEPs' lack of specificity.  (*See* AR at 9.)

Plaintiffs next allege that Damarcus's IEPs lacked measurable baselines, so that his teachers had insufficient information by which to assess his progress.  (*See* Pls.' Mot. for Summ. J. at 17.)  The only law they cite in support of this allegation is 34 C.F.R. § 300.320(a)(2)-(3), which requires a "statement of measurable annual goals" and a description of how "the child's progress toward meeting the annual goals" will be measured, but fail to cite a single case in which a lack of measurable baselines has been found to deny a student a FAPE.  (*See id.*; *see also* Pls.' Opp'n Br. at 16-17.)  The Court therefore agrees with the District that Damarcus's baselines of "grade level 1 confers a plethora of facts about the student's academic performance and ability" to educational professionals (*see* Def.'s Cross-Mot. for Summ. J. at 24), even if those baselines did not relate explicitly to each goal or objective.  In any event, the record does not indicate that Damarcus's teachers were unaware of his lack of progress—rather, the "grade

level 1" baselines themselves indicate that they were all too aware but simply failed to respond

appropriately. (*See infra* at 23-24.)  The Hearing Officer thus did not err in finding that

Damarcus's baselines "include[d] sufficient information to assess [his] progress on each goal."

(AR at 9.)

Plaintiffs also take issue with the District setting goals for Damarcus that measured

success at an 80% accuracy benchmark, when a 90% benchmark would more effectively ensure

mastery before he moved on to a higher-level goal.  (*See* Pls.' Mot. for Summ. J. at 16-17.)

Again, even accepting the basic premise, plaintiffs have failed to show that improperly low

benchmarks caused Damarcus any harm.  (*See id.*)  Even if in theory Damarcus's goals should

have been set higher, in reality his lack of progress meant that the goals were not being met

anyway.  (*See id.* at 20 (from IEP to IEP, "***the Goals themselves remained exactly the same***,"

demonstrating that Damarcus was making insufficient progress).)  And, in any case, DCPS

psychologist Courtney Richmond testified persuasively that the percentage goal matters little

because it is simply a target for improvement, rather than a target for mastery.  (*See* AR at

1270:2-21 ("[I]t's not about the end accuracy.  It's about where he started and where we are

going and can that be done within the course of a year.").

The wholesale repetition of goals and objectives across multiple IEPs is of far greater

concern, however, as it indicates an ongoing failure to respond to Damarcus's difficulties.  *See*

*Roark ex rel. Roark v. Dist. of Columbia*, 460 F. Supp. 2d 32, 44 (D.D.C. 2006) ("Academic

success is an important factor in determining whether an IEP is reasonably calculated to provide

education benefits.") (internal quotations omitted).  Here, an alarming number of goals and

objectives were simply cut-and-pasted (typos and all) from one IEP to the next.  (*Compare* AR at

67-69 *with id.* at 154-55 (2012 IEP goals and objectives in mathematics, reading, and written

expression all repeated word-for-word in 2013 IEP); *compare id.* at 155 *with id.* at 248 (2013

IEP goals and objectives in written expression again repeated word-for-word in 2014 IEP).)  As

multiple District witnesses acknowledged, this repetition of goals demonstrated a lack of

progress and likely frustrated Damarcus.  (*See id.* at 1084:3-6 (testimony of DCPS Speech and

Language Pathologist that the repetition of goals "shows that [Damarcus] wasn't making

progress towards the goals"); *id.* at 1248:12-14 (testimony of DCPS psychologist that

Damarcus's repetitive goals show a lack of progress); *id.* at 230 (statement of DCPS

psychologist that Damarcus is "probably frustrated especially year after year being taught the

same thing").)  The Hearing Officer agreed that repetition of goals "would cause [Damarcus]

anxiety and frustration . . . adding to his disappointment at making slow and limited progress."

(*See* AR at 8-9.)

The IEP Team was therefore required to "revise[] the IEP as appropriate to address . . .

[that] lack of expected progress toward the annual goals."  *See* 20 U.S.C. § 1414(d)(4)(A)(ii).

But there is scant evidence that this occurred, at least in 2013 and 2014.  Rather than raising an

alarm and working to devise a new approach—for instance, one that accounted for Damarcus's

"noted weaknesses" in processing and working memory, which the District now acknowledges

(*see* AR at 416)—it appears that the District persisted in following the same ineffectual path.[7]

Even worse, with regard to speech-language pathology, the District actually *decreased*

Damarcus's monthly services from four hours to two in 2013, then again from two hours to thirty

---

[7] This is not to say that repetition of goals from one IEP to the next is *per se* inappropriate.
*See James D. v. Bd. of Educ.*, 642 F. Supp. 2d 804, 827 (N.D. Ill. 2009) ("[T]he mere fact that a
student's IEP goals are continued does not necessarily mean that the similar IEPs were not
reasonably calculated to confer educational benefit . . . .").  Rather, this wholesale, cut-and-paste
repetition is symptomatic of a larger, more concerning failure by the District to adapt its
approach in the face of Damarcus's continued frustration and lack of progress.

minutes in 2014.  (*See* AR at 71, 159, 251.)  The Hearing Officer inexplicably failed to address

this issue.  The District weakly attempts to argue that because Damarcus made no progress when

receiving four hours of instruction per month, plaintiffs cannot show that the decrease in services

harmed him in any way.  (*See* Def.'s Cross-Mot. for Summ. J. at 26-27.)  This argument suggests

a fundamental misunderstanding of the IDEA, which requires that IEPs be designed to provide a

"meaningful educational benefit."  *See A.I.*, 402 F. Supp. 2d at 167.  It is impossible to meet that

standard by drastically cutting services to a student who is failing to make any progress

whatsoever.  By the District's logic, it would be entitled to sit a failing student alone in a quiet

room for six hours a day, because he would be no worse off there than receiving ineffectual

instruction.

At bottom, it appears that certain members of the IEP team attributed Damarcus's lack of

progress to a single data point (his FSIQ), then all but wrote him off as having "plateaued."  (*See*

AR at 228, 230, 1079:22-1080:11, 1088:16-21; *see also id.* at 1234:1-11 (Damarcus's teacher is

sensitive to the perception that the District is "giving up on Damarcus").)  There are two

problems with this.  First, the IDEA prohibits the District from using "any single measure or

assessment as the sole criterion for determining . . . an appropriate educational program."  20

U.S.C. § 1414(b)(2)(B).  The record suggests that the District placed undue reliance on

Damarcus's extremely low FSIQ score, while disregarding data that more precisely illuminated

his particular challenges.  (*See, e.g.*, AR at 127 (noting that Damarcus's low receptive and

expressive language scores were "commensurate to his overall cognitive skills [Full IQ Scale:

59]"); *id.* at 156 ("It should be noted that his receptive-expressive language skills are

commemorative [sic] to his Full IQ score of 59."); *id.* at 228 (Damarcus "is functioning on his

level and his level is that he has an IQ score of 59").)  Indeed, the cut in Damarcus's speech-

language hours in the 2013 IEP was immediately preceded by a reference to his "Full IQ score of 59." (*Id.* at 156.)  Thus, even though the District's evaluations were not inherently flawed for stating Damarcus's aptitude in terms of FSIQ rather than GAI (*see supra* Part III.A), the District's overreliance on FSIQ to the exclusion of other, more granular data did negatively impact Damarcus's educational plans.

Second, the record is replete with evidence that Damarcus has not "plateaued," and based on this evidence, the Hearing Officer determined that he is capable of making progress.  (*See* AR at 7 ("None of Student's cognitive deficits – including weakness in processing speed and working memory – render him unable to learn."); *see also id.* at 1198:15-22 (testimony by DCPS psychologist that Damarcus's memory deficits make it "more difficult for him to progress. *Not that it's not possible . . . .*") (emphasis added); *id.* at 1252:3-11 (DCPS psychologist acknowledges that Damarcus's standard scores in speech-language demonstrate that he has not plateaued).)  Most tellingly, in the very same paragraph in which the speech-language decrease was first recommended, the District's speech pathologist explicitly stated that "Damarcus demonstrates the ability to improve receptive-expressive language." (AR at 106.)  The pathologist would later testify that she only decided to decrease hours after the February 2013 evaluations showed a plateau (*see id.* at 1080:10-1081:17), but the record is clear that she actually made up her mind months earlier.  (*See id.* at 106 (Nov. 5, 2012 Progress Report).)  In short, the decision to decrease Damarcus's speech-language services rested on an incorrect factual determination and was not calculated to provide a meaningful educational benefit.

The Court thus agrees with plaintiffs that Damarcus's 2013 and 2014 IEPs denied him a FAPE, in that they failed to respond to his demonstrated lack of progress in certain areas and, worse, actually responded harmfully with regard to his speech-language pathology.  However,

the record is not sufficiently developed to allow the Court to determine an equitable award of

compensatory education, given that Damarcus's lack of progress cannot be entirely attributed to

the District's shortcomings.  In other words, the Court rejects plaintiffs' formulaic assertion that

Damarcus is entitled to one full day of compensatory education for every day he was denied a

FAPE in 2013 and 2014, *see Reid*, 401 F.3d at 523, but it cannot at this stage determine what

would be a reasonable remedy.  On remand, the parties must address the issue more fully.

### C.  Least Restrictive Environment

Under the IDEA, children with disabilities must be "placed in the 'least restrictive

environment' so that they can be educated in an integrated setting with children who are not

disabled to the maximum extent appropriate."  *See N.S. ex rel. Stein v. Dist. of Columbia*, 709 F.

Supp. 2d 57, 60 (D.D.C. 2010) (citing 20 U.S.C. § 1412(a)(5)(A)).  Plaintiffs claim that the

District failed to place Damarcus in the least restrictive environment ("LRE"), and instead it

allowed him to interact with non-disabled children only during lunch, when he could have

satisfactorily participated in mainstream classes like science or gym.  (*See* Pls.' Mot. for Summ.

J. at 21-24.)  The District responds that the Court lacks jurisdiction over this claim, because

plaintiffs have not exhausted their administrative remedies.  (*See* Def.'s Cross-Mot. for Summ. J.

at 31-32.)

Plaintiffs are prohibited from "rais[ing] issues at the due process hearing that were not

raised in the due process complaint," unless the school district agrees otherwise.  *See* 34 C.F.R. §

300.511(d).  Plaintiffs do not dispute the fact that they failed to raise this claim in their complaint

(*see* AR at 334-41), nor do they argue that the District agreed to litigate it at the hearing.  Rather,

they claim that they exhausted their administrative remedies because the District failed to object

when they raised the issue during opening statements and in their case-in-chief, and thus, the

Hearing Officer "inappropriately chose not to" decide the issue. (Pls.' Opp'n Br. at 23-24.) Given their own witnesses' testimony about LRE, they claim that there is no need to further develop the factual record (*id.* at 23), but they completely ignore the prejudice to the District, which did not have notice of this claim and thus could not marshal relevant evidence. (*See* Def.'s Reply Br. at 14-15.) Plaintiffs had ample opportunity to properly raise the claim, and indeed, even after the DPC was filed they offered a number of corrections to the Prehearing Conference Order without once raising LRE as an issue. (*See* AR at 392-93.) The mere mention of LRE in opening statements and some limited testimony on the topic was insufficient to place the issue before the Hearing Officer, who understandably did not decide it. *See* 34 C.F.R. § 300.511(d). Because plaintiffs have failed to exhaust their administrative remedies, this claim is dismissed.

### D.  Inappropriate Implementation of IEPs

Plaintiffs next assert that the District failed to appropriately implement Damarcus's IEPs. (*See* Pls.' Mot. for Summ. J. at 24-35.) To succeed on a failure-to-implement claim, plaintiffs must show that the District deviated from the terms of its IEPs in a way that was "substantial or significant," as opposed to merely *de minimis*. *See Catalan ex rel. E.C. v. Dist. of Columbia*, 478 F. Supp. 2d 73, 75 (D.D.C. 2007). However, plaintiffs' allegations do not describe a failure-to-implement claim, but instead they challenge substantive educational choices made by Damarcus's teachers. (*See* Pls.' Mot. for Summ. J. at 26-30 (challenging the use of the Edmark reading program); *id.* at 30-31 (challenging the use of the Attainment program).) The "substantial or significant deviation" standard is therefore inapposite, and the Court will simply consider these claims under the familiar "reasonably calculated to produce meaningful educational benefit" standard. *See A.I.*, 402 F. Supp. 2d at 167.

Their arguments regarding the Attainment program can be quickly dispatched.  They do not attempt to show that Attainment is inappropriate for Damarcus, but only that it is not "research-based."  (*See* Pls.' Mot. for Summ. J. at 30-31 (describing Damarcus's ninth-grade teacher's inability to cite the research on which Attainment is based).)  Plaintiffs bear the burden of proof on this issue.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005) (under the IDEA, "the burden lies, as it typically does, on the party seeking relief").  Here, they have established only that one member of Damarcus's IEP team cannot prove that Attainment *is* research-based, as if the burden of proof rested with the District.  And even if plaintiffs had proven that Attainment is not research-based, the IDEA does not invariably require research-based instruction.  (*See supra* Part III.B (citing 20 U.S.C. § 1414(d)(1)(A)(i)(IV) ("based on peer-reviewed research *to the extent practicable*") (emphasis added)).)

With regard to the Edmark reading program, plaintiffs argue that it only teaches word recognition, and thus it "does not teach students to '*read*,' but instead to recognize 'pictures' of words."  (Pls.' Mot. for Summ. J. at 26.)  They point to their experts' testimony that Edmark will never make Damarcus a functional reader, but that a phonics-based program like Wilson or Lindamood-Bell could succeed in spite of his cognitive deficits.  (*Id.* at 26-27.)  The District responds that Damarcus's cognitive deficits and history of frustration with phonics belies the claim that a phonics-based program would be more appropriate.  (Def.'s Cross-Mot. for Summ. J. at 29-30.)  This is precisely the type of thorny educational policy question that courts are ill-suited to answer, and thus deference to both the Hearing Officer and Damarcus's IEP team is appropriate.  *See Rowley*, 458 U.S. at 206 (IDEA does not invite the courts "to substitute their own notions of sound educational policy for those of the school authorities which they review").  Having just found that the District failed to sufficiently respond to Damarcus's lack of progress,

the Court is not willing to second-guess the decision to use Edmark, since it was one of the few areas in which the District actually *did* adjust to Damarcus's struggles with phonics and try a new approach.  (*See* AR at 768:2-5.)  Furthermore, the record shows that this adjustment is having some success.  (*See id*. at 905:21-906:8 (from September 2014 to January 2015, Damarcus progressed from a grade equivalent of 1.1 to 1.5).)  Thus, even if the Court were to find that a program like Wilson or Lindamood-Bell might have been better for Damarcus than Edmark, the IDEA does not require the District to "maximize each handicapped child's potential."  *See Rowley*, 458 U.S. at 199.

Of course, none of this precludes the Hearing Officer or plaintiffs from directing Damarcus's compensatory award toward a program like Wilson or Lindamood-Bell.  Rather, the Court simply finds that the District's use of Edmark did not deny a FAPE.

## IV.  COMPENSATORY AWARD – BEHAVIOR

After determining that the District denied Damarcus a FAPE by failing to incorporate a Behavioral Intervention Plan (BIP) in his 2013 and 2014 IEPs, the Hearing Officer awarded "50 hours of behavioral support services to be utilized for mentoring, individual and/or family counseling, and/or any other reasonable purpose of Parent's choice."  (AR at 17.)  She also provided that "[a]ny time not utilized by June 30, 2016 shall be forfeited."  (*Id.*)  Plaintiffs now raise three challenges to that award, the first of which is no longer at issue: (1) restricting the use of the award to behavioral services is arbitrary and illogical; (2) requiring that all hours be used by June 2016 is arbitrary and illogical; and (3) the award is far too small, given the pervasive effect that Damarcus's behavioral problems had on every area of his education.  (*See* Pls.' Mot. for Summ. J. at 35-39.)

In its cross-motion, the District argued that plaintiffs' request for relief from the behavioral-services restriction was unnecessary, because the clause "or any other reasonable purpose of Parent's choice" was broad enough to encompass non-behavioral services. (*See* Def.'s Cross-Mot. for Summ. J. at 34.)  Plaintiffs understandably infer that the District now approves of a broader use of the hours (Pls.' Opp'n Br. at 26 n.11), and the Court agrees that plaintiffs may use the hours for any reasonable, non-behavioral services, including educational instruction.

As to the temporal restriction on plaintiffs' use of the hours, the HOD "contains neither reasoning to support this [restriction] nor factual findings showing that the [restriction] satisfied [Damarcus's] needs," so the Court cannot simply rely on the Hearing Officer's exercise of discretion. *Reid*, 401 F.3d at 521.  The IDEA requires that school districts provide students a FAPE only through age twenty-one, *see* 20 U.S.C. § 1412(a)(1)(A)-(B), but courts regularly allow the use of compensatory awards beyond that period. *See Brooks v. Dist. of Columbia*, 841 F. Supp. 2d 253, 258-59 (D.D.C. 2012).  By contrast, Damarcus will have just turned sixteen when his unused hours would otherwise be forfeited. (*See* Pls.' Mot. for Summ. J. at 39.)  The District tries to justify the restriction by arguing that "ensuring the Plaintiffs quickly utilize the hours . . . would [prevent] the parents [from manufacturing] additional IDEA violations by refusing to attempt to supplement the student's education." (Def.'s Cross-Mot. for Summ. J. at 34.)  The suggestion that Damarcus's mother would jeopardize her son's well-being for some hollow litigation advantage is refuted by the record.  She has been tireless in her efforts to secure an appropriate education for Damarcus. (*See, e.g.*, AR at 225-235 (transcript of mediation in which K.S. was a frequent participant); *id.* at 66 (2012 IEP meeting); *id.* at 153 (2013 IEP meeting); *id.* at 243 (2014 IEP meeting); *id.* at 850-63 (due process hearing testimony).)

Therefore, the Court finds the award's temporal limitation to be arbitrary and an abuse of discretion.

Plaintiffs finally challenge the behavioral award as insufficient, because the failure to provide Damarcus a BIP in 2013 and 2014 "pervaded his entire school day," thus requiring a much larger remedy than fifty compensatory hours.  (*See* Pls.' Mot. for Summ. J. at 35-36.)  An award of compensatory education "must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place."  *See Reid*, 401 F.3d at 524.  The Hearing Officer did explain her award, noting that the failure to provide a BIP "was mitigated to some extent by the behavioral support services [Damarcus] received," but nonetheless, Damarcus would have benefited from additional positive behavioral supports because he "thrives on praise, affirmation and extra attention."  (AR at 13-14.)  Were Damarcus's behavior a self-contained issue that did not otherwise affect his education, the Court would find no abuse of discretion.  However, despite the fact that the Hearing Officer found that Damarcus's "in-school behavioral challenges are closely connected to his academic frustrations" (*id.* at 7), that finding is not adequately reflected in her compensatory award.  (*See id.* at 13-14.)

The record is crystal clear that Damarcus's behavior heavily impacted his academic progress.  (*See, e.g.*, *id.* at 131 ("Thus, these behavior concerns have impeded his overall academic progress towards his IEP goals."); *id.* at 157 (behavior issues "prevent[] him from attending to academic tasks and continued participation in the general education curriculum"); *id.* at 245 (Damarcus's behavior "impedes [his] learning or that of other children").)  For instance, when the District conducted a behavioral assessment in 2015, his teacher reported that Damarcus's behavioral issues arose "from the time he gets to school until he leaves."  (*See id.* at

432-37 (concluding that the "behavior interrupts the instructional dynamics and delays the academic performance").)  The District does not dispute that there are "areas in which [Damarcus's] performance declined because of his behavior," but it simply argues that plaintiffs have not offered evidence showing how many hours are necessary to correct the deficiency.  (*See* Def.'s Cross-Mot. for Summ. J. at 33-34.)  This is not entirely true.  Plaintiffs' behavioral expert testified that Damarcus required a full day of compensatory education for every day that he lacked appropriate behavioral and reading supports.  (*See* AR at 668:11-15, 669:19-670:9.)  However, that testimony does not separate out reading from behavioral issues, nor does it account for the two hours of behavioral support that Damarcus received monthly throughout this period.

Although it is clear that plaintiffs are entitled to an award that better addresses the pervasive impact of Damarcus's behavioral problems, the Court is not in the position to grant the remedy suggested by plaintiffs.  The Court will therefore remand to allow the Hearing Officer and the parties to address this issue.

## V.  INDEPENDENT EVALUATION REIMBURSEMENT

Following the District's February 2013 evaluations of Damarcus, plaintiffs filed a January 2014 DPC seeking an Independent Educational Evaluation ("IEE") of Damarcus, on the grounds that the District's evaluations were inadequate.  (*See* AR at 236-42.)  The District was thus faced with two alternatives: either (1) file a DPC "to request a hearing showing that its evaluation [was] appropriate," or (2) "[e]nsure that an independent educational evaluation is provided at public expense."  *See* 34 C.F.R. § 300.502(b).  It is undisputed that the District did neither, and therefore, the District shall reimburse plaintiffs for the neuropsychological IEE that they obtained at their own expense.

The District raises two objections.  First, it argues that plaintiffs' request for an IEE was withdrawn when they withdrew their January 2014 DPC.  (*See* Def.'s Cross-Mot. for Summ. J. at 35.)  Even if that were correct, the District still fails to account for the operative DPC that plaintiffs filed subsequently, in which they sought "reimbursement for the IEE completed by Dr. Lisi Levisohn."  (*See* AR at 338.)  The Hearing Officer denied this relief without explanation, ordering only that plaintiffs be reimbursed for Dr. McLaughlin's behavioral evaluation.  (*See id.* at 17.)  Second, the District argues that it *did* offer to pay its standard rate for IEE reimbursement, but plaintiffs "unreasonably refused" this offer as insufficient.  (*See* Def.'s Cross-Mot. for Summ. J. at 35.)  The District fails to explain how a partial offer of reimbursement satisfies its obligation to "[e]nsure that an independent educational evaluation is provided at public expense."  *See* 34 C.F.R. § 300.502(b)(2)(ii); *id.* § 300.502(a)(3)(ii) (defining "at public expense" to mean that the agency "either pays for *the full cost of the evaluation* or ensures that the evaluation is otherwise provided at *no cost to the parent*") (emphasis added).  To the extent the District believed that plaintiffs' reimbursement request was unreasonably high, it was obligated to initiate a due process hearing, which it did not.  *See* 34 C.F.R. § 300.502(b)(2); Guidance Letter from Stephanie S. Lee, Office of Special Educ. and Rehabilitative Servs., U.S. Dep't of Educ. (Oct. 9, 2002)[8] ("If the total cost of the IEE exceeds the maximum allowable costs and the school district believes that there is no justification for the excess cost, the school district . . .  [must] initiate a hearing . . . .").  Therefore, the Hearing Officer erred in failing to award reimbursement for Dr. Levisohn's neuropsychological evaluation of Damarcus.[9]

---

[8] Available at http://www2.ed.gov/policy/speced/guid/idea/letters/2002-4/redact100902iee4q2002.pdf (last visited May 23, 2016).

[9] It is worth noting that the Hearing Officer found that the challenged IEPs were based on "sufficient formal and informal assessments," from which she could have implicitly concluded

## VI.  REHABILITATION ACT

Plaintiffs also seek relief under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which mandates that no qualified disabled person "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  (*See* Pls.' Mot. for Summ. J. at 41-44.)  Although they acknowledge that their Section 504 claims are largely duplicative of their IDEA claims, plaintiffs assert that they would be entitled to expert witness fees only under Section 504.  (*See* Pls.' Opp'n Br. at 28.)  The difficulty for plaintiffs is that the standard for relief under Section 504 is more stringent than that under the IDEA, and they have not made the requisite showing.

In cases involving benefits provided under the IDEA, plaintiffs must show "something more than a mere failure to provide the 'free appropriate education' required by" the IDEA.  *See Lunceford v. Dist. of Columbia Bd. of Educ.*, 745 F.2d 1577, 1580 (D.C. Cir. 1984) (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982)).  This is apparent from the language of Section 504 itself, which prohibits discrimination solely on the basis of disability, while the IDEA more broadly reaches negligent acts such as incorrect evaluations and student placements.  *See Monahan*, 687 F.2d at 1170.[10]  In other words, Section 504 does not "creat[e] general tort

---

that plaintiffs' neuropsychological IEE was unnecessary and thus non-compensable.  (*See* AR at 9.)  If so, that would ignore the District's obligation to "file [the] due process complaint" regarding that issue, 34 C.F.R. § 300.502(b)(2)(i), which not insignificantly places the burden of proof on the District to show that its evaluations were adequate.  *See Schaffer*, 546 U.S. at 51. Had the District raised the reimbursement issue and thus shouldered the burden of proof, it may have been reasonable to overlook the technical failure to "file" a complaint, because the issue was properly presented for resolution; however, the transcript makes clear that plaintiffs improperly shouldered the burden of proof on this issue.  (*See* AR at 624:20-22.)

[10] Although the *Monahan* court considered Section 504 in relation to the Education for All Handicapped Children Act of 1975 ("EACHA"), its analysis is equally applicable here because

liability for educational malpractice," but instead requires a showing of "bad faith or gross misjudgment" on the part of school officials.  *See id.* at 1070-71.  District courts in this circuit have consistently required the same.  *See, e.g., Torrence v. Dist. of Columbia*, 669 F. Supp. 2d 68, 72 (D.D.C. 2009) (Section 504 "is attuned to programmatic failures while the IDEA is focused on the individual student who needs special education"); *Lucas v. Dist. of Columbia*, 683 F. Supp. 2d 16, 19 (D.D.C. 2010).

Nothing in the record supports such a finding here.  Plaintiffs do not meaningfully argue otherwise, only claiming baldly in a footnote that "Damarcus'[s] clear failure to progress for many years, even while being provided with educational supports during those years, supports any required finding that DCPS acted with gross negligence."  (Pls.' Mot. for Summ. J. at 44 n.29.)  This argument ignores the severity of Damarcus's disability, which even plaintiffs' experts acknowledge.  (*See* AR at 280 (scores on the WISC-IV Intelligence Scale fall in the Borderline and Extremely Low ranges); *id.* at 301 ("Additional tests . . . showed <u>extremely deficient auditory working memory</u> and <u>auditory processing</u>.")  Thus, although both the Hearing Officer and the Court have found errors that adversely impacted Damarcus, his progress is also seriously impeded by his disability, so a lack of progress alone is insufficient to demonstrate bad faith or gross negligence.

## VII.  DEVELOPMENT OF AN APPROPRIATE IEP

Finally, plaintiffs seek an order requiring the District to "immediately develop an appropriate placement and program for Damarcus moving forward."  (Pls.' Mot. for Summ. J. at 44-45.)  Because this is precisely what the IDEA already requires of the District, the Court

---

the IDEA replaced the EACHA.  *See Torrence v. Dist. of Columbia*, 669 F. Supp. 2d 68, 71 (D.D.C. 2009).

construes this request as seeking something more than a general prohibition against future IDEA violations.  Rather, plaintiffs seem to invite the Court to order that specific IEP components be adopted by the District (*see id.* at 44 n.30; AR at 392), thereby supplanting the District in its role as educator.  Plaintiffs offer examples of components that they believe are necessary, such as "a research-based reading program" like Wilson or Lindamood-Bell that focuses on phonics, a more individualized transition plan, and an appropriate BIP.  (*See* Pls.' Mot. for Summ. J. at 44 n.30.) These examples actually help to demonstrate why such an order would be inappropriate given the posture of the case—a challenge to IEPs developed in 2014 and earlier, rather than a challenge to Damarcus's current educational program.  (*See* AR at 449-69 (Feb. 2015 IEP not at issue here).)

The record as developed does not really speak to the adequacy of Damarcus's current plan (whether the February 2015 IEP or more likely its 2016 successor), nor have the parties sufficiently briefed that issue.  For instance, plaintiffs refer twice to the need for an appropriate behavioral support plan (*see* Pls.' Mot. for Summ. J. at 44 n.30), but the record reflects that a BIP was put into place on February 10, 2015.  (*See* AR at 438.)  Similarly, the record does not reflect a "general and non-individualized" transition plan that fails to account for Damarcus's interest in auto mechanics.  (*See* AR at 464 (Feb. 2015 IEP stating that Damarcus "will research and identify at least (4) possible car mechanic training program[s] that match [his] needs").)  Again, it is not even clear to the Court whether the 2015 IEP is still Damarcus's operative plan.  Thus, plaintiffs in effect ask the Court to blindly order relief that may now be unnecessary or, worse, counter-productive for Damarcus in light of his 2016 IEP.  *See B.D. v. Dist. of Columbia*, 817 F.3d 792, 803 (D.C. Cir. 2016) (plaintiffs' request for a new, appropriate IEP mooted by

District's subsequent creation of an appropriate IEP).  Given these deficiencies in the record, the

Court is unwilling to order an overhaul of Damarcus's current IEP.

## CONCLUSION

Accordingly, the parties' cross-motions for summary judgment are **GRANTED IN**

**PART** and **DENIED IN PART**.  A separate order accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:  May 23, 2016